Case number 23-5750 Anthony Mattera et al versus Robert Baffert et al. Oral argument, 15 minutes for plaintiffs, 15 minutes to be shared by defendants. Mr. Nefsker for the appellants. May it please the court. Good afternoon, your honors. Willa Nefsker on behalf of the appellants. I would like to reserve three times for, excuse me, three minutes for rebuttal. All right. The questions before you today are these. Does Kentucky law allow a trainer to break the rules of horse racing? And does it allow a racetrack to either condone or turn a blind eye to that? So that it then ultimately and directly leads to a result that leaves the betting public with the non-payment of correctly placed wagers. Second, should they be able to hide behind certain statutes and regulations as a form of immunity and avoid being subject to Kentucky common law and equitable causes of action? The answer is no. The appellants bring five causes of action in their complaint. Negligence, breach of contract, a violation of the Kentucky Consumer Protection Act, unjust enrichment, and injunctive relief. All of these causes of action represent valid claims under the law and facts of this case. I would first like to focus on the negligence claim. Kentucky law requires a demonstration of a legally cognizable duty, a legally cognizable relationship, and a reasonable expectation of a duty owed. The appellants meet this requirement. With respect to the Baffert appellees, when you distill down to its essence, the duty that they owe to the wagering public, it is this, to refrain from entering ineligible horses into races. That comes from the laws and regulations of the state of Kentucky that govern horse racing. I don't think there's any dispute that those laws and regulations contain standards of conduct for a horse training. But they also, in addition to that, explicitly intend to protect the wagering public. So you have the legally cognizable relationship. Let me ask you this. How does the wagering public get away from the fact that when they go to wager, the Churchill Downs of the racing industry there has a set of regulations, and the regulations say, number one, if you bet, you bet at your own risk, and also says that if the horses finish in a certain order, the order of finish prevails, even if a horse later is disqualified, or there's something found wrong with the race and all that, still the initial order of finish is what's going to determine the calculation and payment of the bets. And when you go to bet, you know what those rules are in advance, and you bet anyway. So how are you going to show harm when these regulations are publicly announced and implemented for the betting public? Well, first, Judge Clay, I would say that I don't know that there's a specific regulation that says you bet at your own risk. And number two, what you're referencing are with respect to parimutuel payouts, and my clients are not seeking the parimutuel payout. It's very clear under Kentucky laws and regulations that parimutuel payouts are final. You cannot claw those back. You cannot reverse those. What my clients are alleging is that they've been legally harmed, they have a legal claim under Kentucky common law and equity, and that they have legal damages because of the breach of a duty. And in relation to that, is it your argument that the regulations are contrary to or violative of Kentucky common law? No, I believe they support the claims in Kentucky common law, the regulations in the statutes, because they provide for standards of conduct, which provide the foundation and the basis for a duty. And they also explicitly intend to protect my clients, the appellants in this case, which are part of the wagering public. So they support the common law claim. And to go even further, one of the cases we cite is the James versus Churchill Downs Inc. case, which explicitly states that these statutes and regulations, unless they explicitly state in the statute of regulations that they abrogate common law, they do not. And common law causes of action still exist. And that's the basis, that's one of the bases of my clients' claim for negligence. Yeah, maybe I could, I guess I'm not clear on the answer. I'm just wondering what the harm is. I mean, your clients had what ended up being losing wagers. Because once you have the official order, that's set for pari-mutual betters, as I understand it. Right. So they've got losing wagers. And what you're saying is that you've got these claims, including negligence claims. Right. But I'm still having a hard time determining where the harm is. You're arguing that these losing wagers somehow will, maybe you're not really arguing this, but you will be turned into winning wagers. No, not exactly. Not exactly. What the argument is. I know it's a negligence-based claim, but I'm just trying to get a sense of what the harm is. Thank you, Judge. And that's a great point. And what the damages would be. Correct. And I would also remind the court that we don't only make negligence claims. We also have claims for breach of contract, unjust enrichment, which I think, you know, they're the argument for damages and the harm would be maybe just a little bit different. But with respect specifically to negligence, it's not that they've got losing wagers that have converted into winning wagers. It's that they have now, by operation of Kentucky law, through the Horse Racing Commission's disqualification of the horse. That, by operation of law, takes that disqualified horse to the back of, to the last place, and elevates everyone one up. And so by operation of law, there's a new official order of finish, which now means that my clients hold correctly placed wagers, but they have no avenue for settling those wagers. Isn't that contrary to the Kentucky Administrative Regulations? No, because we're not seeking, we're not seeking parimutuel payouts. We're not seeking a clawback or a redistribution of the parimutuel payouts. We're seeking legal damages for a legal injury under a common law cause of action. So, if I am understanding, and correct me here if I'm wrong, you're saying that Churchill Downs, for example, has a general duty to operate a racing operation as a reasonable race operator would, to quote my torts professor. And that, as I understand your argument, that they failed to do so with that reasonable race operator standard by not doing a pre-screening or not somehow keeping this horse out. Now, what I understand Judge Hales have said here is, well, had they kept that horse out, we don't know what the outcome would have been that you would have held these, this particular order that is, that is maybe now a winning order. Now, you might have an argument, although I don't hear you making it, that gosh, if we knew that they weren't operating like a reasonable racetrack, we just wouldn't have bet. Or, you know, we had, you know, the value of our, of our participation is different. And that doesn't matter what order you put them in. But as you're arguing, and I think this goes on to Judge Cole's question, the fact that you hold this, that made this specific bet, this particular order, you know, we don't know had they taken had they disqualified this horse ex ante what the order would have been. Well, so your, so your question goes to causation. And cause, and the first argument I would make to the court is that causation is a factual question and it would be premature. It was premature of the district court to decide that. It would be premature for this court to decide that. In other words, I may be able to come up with proof. Let's say I hire an expert witness that can, that can come up with a computer model and run simulations and prove my client's case. That, yeah, they would have come in in this order in the absence of this horse. That's number one. And that's why you pled? That I could, that we retained an expert to do that? No, that you, that you had causation. Yes. In that way, that if this horse hadn't run, that it would have been this order. Yeah, no. We, what we plead is that not, that not in the absence of this horse would it have come in in this order. It's because this horse ran that the new official order of finish now exists. Which leaves my clients with correctly placed wagers that cannot be settled through a parimutuel pool. And so that they, so that they now have a cause of action under Kentucky common law and an equity for unjust enrichment. Well, where in the rules or even the law does it say that if a horse is disqualified, everybody, all the other horses move up in place in order of finish? In other words, you're saying that if you take away the bad horse, you have a configuration that you say should be used to calculate the winning bettors. Yes. But what's the basis for that assertion? Because since there's nothing that's in the briefing of counsel on both sides here that says that that's what the rules are or what the law is. So that's, that's the result you're arguing for, but what's the support of a legal basis for that? For calculating the damages or for the, for the, for the disqualification? I think your first question was disqualification. Yeah, but I'm ultimately getting to the damages. Yeah. Because you're saying that the order of, the order of finishers change in relation to what the order would be minus the bad horse. And there's not, there's nothing in the regulations or even the common law that has been brought to our attention that says that. So the, the calculation for damages would be this. You go back and you take the amount, the money that was bet into the parimutuel pools, and you subtract the takeout, which is the commission basically that Churchill Downs, you know, Churchill Downs is basically a bookie. They book the bets and they take a commission, a percentage, and then they distribute the rest of the money to the winning tickets. So you can go back and you can take that amount of money and then recalculate it, figuring out, you know, if, if the ordered finish was now, the new official order of finish, that was the order of finish on the day of the race, then you can figure out what the parimutuel payouts would have been. But we don't know who would have run had they not been negligent and kept the horse out. Well, And you told me you didn't even plead that that would be the order had this horse not run. Well, and I, and your honor, with respect, I don't think we have to plead that in order to win. It's not, it's not that this, I see that I'm out of time, but let me just finish. It's not that it's in the absence of this horse, it's because this horse ran, it produced this new order of finish. Thank you very much. May it please the court, I'm Jeff Mode, I represent Churchill Downs. Splitting time today with Mike Moiser, who is counsel for Bob Baffert. Mr. Moiser is going to be focusing on the duty element of the negligence claim, public policy considerations, and other Baffert specific issues. On behalf of Churchill Downs, I'd like to focus my argument on two case dispositive issues. Number one, these plaintiffs did not place winning wagers and thus are not entitled to any payment under the rules of the Kentucky Horse Racing Commission. Number two, these plaintiffs cannot connect the alleged wrongdoing, that is, for my client, Churchill Downs letting this horse run in the race with their alleged harm, that is, lost parimutuel wagers. For either of those two reasons, this whole case is dismissed. If I could start with the regulations, there is one way to have a winning wager on a horse race in Kentucky, and that is to match your parimutuel ticket with the official order of finish as declared by the stewards on the day of the race. They did not do that. They do not have winning wagers. They are not entitled to any payment. There is no common law right to collect on a wager in Kentucky. In fact, gambling is illegal in Kentucky and wagers are unenforceable, subject to a few notable exceptions. For instance, people can wager on, people can participate in parimutuel wagering on horse races, and they can do so because the General Assembly, the Kentucky General Assembly, and the KHRC have allowed it, and they've allowed it under a very strict set of rules that say exactly what happens here. The KHRC's rules plainly state that parimutuel wagers must be paid according to the official order of finish as declared by the stewards on the day of the race. Any subsequent changes may be important for the record books, the purse money, or a trophy, but they have no bearing whatsoever on the bettors. This is called the finality rule. It actually appears three times in the KHRC's rules. It's been the law in Kentucky forever. It's the law in every single jurisdiction that offers parimutuel wagering on horse racing. Is your argument then that Churchill Downs or any race track in Kentucky could never be liable under a negligence theory? Like even if they, at least to the bettors, right? What if they, you know, engaged in some sort of, you know, were grossly negligent in how they ran their races. They started the races wrong. Maybe they, I'm trying to think, I don't know horse racing super well. I'm not from Kentucky, but maybe they even engaged in fraud and knew about the horses or things like that. Are you saying based on how the regulations are done that bettors never have a cause of action? So, the White case actually addressed that exact same issue. There was a fraud claim in the White case, Sixth Circuit case applying Kentucky law, and the court said no, those claims are not allowed. And in fact... So if the racetrack knew the doping was going on, maybe inside dealed and bet on, you know, other horses itself and, you know, was running a scam and so knew that there wouldn't be a fair race, none of the bettors could sue. If that were the, yes. I'm not saying that happened here, but I'm trying to understand your argument as to the Kentucky regulations and how far they preclude common lawsuits. Yes, so number one, of course that didn't happen here. Number two, that's what the White case says. Not even a fraud claim can be asserted. If that happened, we, Churchill Downs, would have significant problems with our regulator, with the Kentucky Attorney General, and in the marketplace. But the solution there is not a common law claim from the bettor, because there is no common law right to bet. The only way that you can recover on a wager, on a horse race, is under the regulations. That's it. Would you address the breach of contract issue? As I understand it, plaintiffs are arguing that there's a contract that exists between Churchill Downs here and the pari-mutual bettors that deals with, I guess, how the whole betting process is administered, among other things. So where do we stand with the existence, even the existence of a contract? My understanding is that you argue there is no contract. Certainly. So, two parts. Number one, I don't think you need to get there, because I think the rules in this causation issue dispose of all the claims. But then there's a two-part answer to that contract claim. Number one, there is no contract between Churchill Downs and the bettors. We cite the... I'm sorry, go ahead. You can finish. The D'Sinza case from New York in the, I'm gonna butcher the pronunciation, Bourgeois, maybe from Louisiana, say that there is no contract between Churchill Downs and, or between a racetrack and between pari-mutual bettors, because the racetrack is a mere stakeholder in the pari-mutual system. Now, Judge Hale and some other cases have said that if there is a contract, then the rules are a part of it. And it's Churchill Downs' job under those, under that scenario to administer the wagers according to the rules. That would include the finality rule. That would require us to pay out the wagers in accordance with the official order of finishes declared by the stewards on the day of the race. Now, we've cited a dozen cases like this one, including the white case from the Sixth Circuit Applying Kentucky Law, holding that bettors in this situation have no claim against a racetrack. They get there for a variety of reasons. They say bettors are bound by the rules of the game they choose to play. There are public policy considerations to where the entire system of pari-mutual wagering would collapse, would be inoperable if claims like this were allowed, that gambling is different, and that you're only allowed to recover under the rules of the game, or that courts should not displace racing officials in determining who the official order of a finish is. But the cases are unanimous. We've cited a dozen of them. There were more that didn't make it into our brief. Confronted with that, below in here, they have not cited a single case that allowed a better claim like this one to proceed. Not a one. There's a good reason for that. On page 33 of their briefs, they allege that if they do not have, quote, winning wagers, they, quote, have no damages claim to make. That's where we're at here. They don't have winning wagers. They have no damages claim to make. Very quickly on my next point, also dispositive. They cannot connect the alleged wrongdoing with the alleged harm. As was pointed out earlier during my colleague's argument, their entire theory is that that horse should not have been allowed to run in the race. Well, they don't contend that they would have won if Medina Spirit hadn't raced. In fact, they concede the point. It's in a bullet point on the first page of their reply brief. It's conceded. I understand the concession because there's no way they could ever prove that, but they've conceded the point. It's not even an issue here. So here's what they do. They try to claim victory based on the new official order of finish, and that's just not how the racing rules work. They can't connect their alleged wrongful act with the alleged harm. That should be the end of the case. My time is up. Thank you. Good afternoon. May it please the court. My name is Mike Moiser, and I, along with Elizabeth Woodford, represent Bob Baffert and Bob Baffert Racing. These finality rules we've been discussing are more than just technical rules. They reflect the creation of public policy by the Racing Commission in Kentucky, and as has been pointed out by the Churchill Downs Council, without those rules, we could not have parimutuel wagering. It is very common in racing now, because of testing delays, to have disqualifications happen weeks, months, even years after the race is run. So it's absolutely essential that that be followed. I agree that there is no way that these gentlemen had a winning wager, because, as the court just noted, there's no way to know, if Medina Spirit hadn't run in this race, where any of the other horses would have finished. And it does matter for the trophy, it does matter for the purse, but there's no way to affect the outcome of the wager, because the regulations say that can't happen. The common law negligence claim in this case against Mr. Baffert fails, because there is no legal duty by a horse trainer to a better. That's pretty simple. They tried to point to the universal duty of care in Kentucky law, and told you that there would have been a seismic change in Kentucky, in the expansion of tort liability under that concept. But as recently as six months ago, the Kentucky Supreme Court, in the New Albany case we cited to you, reiterated that that's nothing but a catchphrase, and that it can't create a cause of action, unless there's a recognized legal relationship. And we simply don't have that here. The cases they cited to you were premise liability cases, employer, employee, store owner, invitee, hospital invitee. We don't have any relationship like that in this case. They also cannot maintain a negligence per se claim. That's because Kentucky statute, which enables that cause of action, KRS 446070, requires that in order to make a negligence per se claim, under a regulation, you have to show not only that you're within the class of persons it was intended to protect, but also that that regulation relates to the safety of the citizenry. Now why isn't the gambling public a class of persons intended to be protected by regulations meant to insure a fair race? Well the absolute insurer rule and the medication rule, those are actually intended to protect the participants in the race. Because if horses are affected by medication, the argument is they may endanger the jockeys, they may endanger another horse. And that's the scope of people who were intended to be protected. Moreover, because of the finality rules, it's very clear that the racing commission intended no protection for bettors under this regulation scheme. And there's a lot of regulations on the Kentucky Horse Racing Act. But the most important point about duty is that even if they could establish a source of duty on the part of Mr. Baffert, there's no proximate cause here. This case, really on that issue, is your white case all over again. It's just slightly different about what they're claiming happened. In fact, I would argue that the white case was easier to point to as something that actually affected the bettor's decision to bet because it dealt with an unpublished workout. Again, the plaintiffs try to get around all that by telling you that it doesn't have to make that determination because the stewards reordered the finish. But there is no way to know how that race would have been run. It is totally speculative to try to say who would have finished first, second, third, fourth, or fifth if Bob Baffert had or had not done a particular act. And even where the results of a race in Kentucky have been challenged by somebody who does have standing to complain, like another owner or a jockey, the courts have refused to engage in that kind of speculation. That's why the class racing case table was cited below and we cited it as well. But finally, there's no causation here for a much more simple reason. The entity which is solely charged with regulating horse racing in Kentucky has determined as a matter of law that a change in the order of finish due to a disqualification will not change a bettor's rights with regard to his or her wager. Proximate cause requires not only causation in fact, but also the absence of public policy rule of law which prohibits the imposition of liability. And that's exactly what we have here. When you get down to the essence of this case, the plaintiff's real complaint is they don't like the rules. And if they don't like the rules, there's a process by which they could change the rules. But it's not this court. Thank you very much. Thank you. I want to pick back up on the breach of contract issue to start out the rebuttal. And Judge Cole, you asked about this and one of the things I want to highlight to you is that the case law suggests that in this scenario, that the rules and regulations would fill out the terms of the contract so to speak. Obviously you need an offer of acceptance and consideration. I don't think there's any dispute that you have all that here. But then what are the terms of the contract? Well, under Kentucky law and regulations, one of the specific terms that CBI, Churchill Downs, must offer is that their races will not include entry of horses that have been administered any prohibited drug. I don't think there's any dispute about that. That's what is required of them under the Kentucky laws and regulations of horse racing. That's what happened here. They allowed a horse that was ineligible to race into one of their races. That is a violation of the terms of the contract that is a parimutuel wager. You're saying no matter how careful they were, it's like strict liability. If it's found out later that one of the horses had, maybe it was indetectable, had they done the most sophisticated testing beforehand, they're like strictly liable under contract if later on it turns out that we find out one of the horses had an impermissible substance. No, I don't think you need to go that far, Your Honor, because in this case, they did nothing. They did nothing to try to... But you're talking about the terms of the contract. You're just telling me a term of the contract is that none of the horses can have illicit substances. Correct. And that if there's a violation of that term, then it's over. There's a breach of contract. Correct. But in order to violate that term, they would have to fail to live up to the obligations under Kentucky laws and regulations, which is what happened here. So, and then, once you get the damages on the contract, it would be, we're not talking now about the tort damages of what the winning wager would be under the pair of mutual payouts. Now we're talking about return of consideration, potentially specific performance, so the damages would be a little bit different in this breach of contract scenario. And also, with respect to that, similar is the unjust enrichment. They don't even challenge the first two requirements or elements of unjust enrichment. Only the third one, that they retained a benefit. And in this case, the benefit that they retained were the wagers that were made by my clients, and potentially a class of plaintiffs, that were made on a game that was unfair, and a game that was unfair because of their failure to live up to obligations under Kentucky law and regulations. They appreciated that benefit. It's been retained by them. See, my time's up. And it hasn't been returned, and that equals unjust enrichment. Yeah, I just want to make sure that I'm clear. I thought in your briefing, you pretty much concede that there's no way one could predict the order of finish had Medina's spirit not run. I mean, there's no way, you talked about simulations and things of that nature. I mean, that might give some probabilities and things of that sort. But you agree, I think, in the briefing that, I mean, there's just no way to know what the order of finish would have been if Medina's spirit had not run in the race. Do you agree with that? I think that without something more sophisticated than developing a computer model that could predict that, yes, Your Honor. I mean, a computer model, you know, would give you probabilities and things of that nature. And then that becomes a question, you know, a dauber question, basically, if I can elicit that proof. And then it becomes an issue for motion for summary judgment, but not one to dismiss. Right, thank you. Just one moment. What do you want us to order to dispose of this appeal? Well, to reverse the district court's motion to dismiss, number one, and also to reverse their motion denying our leave to amend the complaint and add additional facts and claims. And that's it? Yes. Okay, thank you.